FILED
9/30/22 12:57 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | Case No. 17-20639-GLT |
|  | : | Chapter 13 |
| LAURA L. REPPERT, | : |  |
|  | : | Related to Dkt. Nos. 60, 64-66, 69, 73-74, |
| *Debtor*. | : | and 79 |
|  | : |  |

| | |
|---|---|
| Dennis J. Spyra, Esq. | Owen W. Katz, Esq. |
| Spyra Law Office | Office of the Chapter 13 Trustee |
| Pittsburgh, PA | Pittsburgh, PA |
| *Attorney for the Debtor* | *Attorney for Ronda Winnecour* |

## <u>MEMORANDUM OPINION</u>

The failure to timely disclose post-petition assets in chapter 13 cases is the concealment of property of the estate and, therefore, must carry heavy consequences no matter how late in the case it occurs. It is undisputed that Laura L. Reppert ("Debtor") took title to an unencumbered 2021 BMW 235 automobile (the "BMW") in March 2021, approximately four years into her chapter 13 case, but did not inform the Court or chapter 13 trustee.[1] Instead, the existence of the BMW was revealed nearly a year later by the Debtor's husband in his own bankruptcy.[2] This prompted an evidentiary hearing on an *Order to Show Cause* why, among other things, the Debtor's now-completed chapter 13 case should not be dismissed with prejudice for her failure to promptly disclose a substantial post-petition asset.[3] The Debtor primarily argues that the BMW was an early birthday gift from her parents to her then 14 year old daughter.[4] For the

---

[1]     See *Exhibit A*, Case No. 21-22274-GLT, Dkt. No. 91-1.

[2]     *Motion to Convert Case to Chapter 13 or, Alternatively, Dismiss Chapter 7 Case*, Case No. 21-22274-GLT, Dkt. No. 91 at ¶ 11.

[3]     *Order to Show Case*, Dkt. No. 70 at ¶ 1.

[4]     *Response to Order Setting Status Conference*, Dkt. No. 64 at ¶¶ 1-2.

reasons set forth below, the Court is unconvinced, leaving a dismissal with prejudice the only appropriate outcome under these unusual circumstances.

## I.    BACKGROUND

The Debtor filed her chapter 13 petition on February 21, 2017.  Although it was not discovered at the time, she failed to list her general unsecured creditors on the creditors mailing matrix and they did not receive notice of this filing.[5]  Nevertheless, the Debtor scheduled nonpriority unsecured claims totaling $29,150.43 on *Schedule E/F*.[6]  Since she listed only $6 of monthly net income on *Schedule J*,[7] no iteration of her confirmed plan ever contemplated a dividend to general unsecured creditors.[8]  Instead, the plan focused on curing mortgage and real estate tax arrears.[9]  Thus, the lack of unsecured creditor engagement was unsurprising given their prospects.

The Debtor's case proceeded quietly until February 2022, when the chapter 13 trustee moved to dismiss because the plan term had elapsed without the Debtor satisfying her financial commitment.[10]  At the same time, the Debtor's husband, Todd Reppert, sought to convert his chapter 7 case to chapter 13, or alternatively dismiss it.[11]  It is undisputed that they have been married at all relevant times despite the Debtor having indicated that she was not married on her *Statement of Financial Affairs*.[12]  Critically, to refute an allegation by the United States Trustee

---

[5]    *Notice Regarding Filing of Mailing Matrix*, Dkt. No. 2.

[6]    *Schedule E/F: Creditors Who Have Unsecured Claims*, Dkt. No. 7 at 13-17.

[7]    *Schedule J: Your Expenses*, Dkt. No. 7 at 23.

[8]    See, e.g., *Chapter 13 Plan Dated September 17, 2019*, Dkt. No. 48-1.

[9]    Id.

[10]    *Trustee's Motion to Dismiss*, Dkt. No. 58.

[11]    *Motion to Convert Case to Chapter 13 or, Alternatively, Dismiss Chapter 7 Case*, Case No. 21-22274-GLT, Dkt. No. 91.

[12]    *Statement of Financial Affairs for Individuals Filing for Bankruptcy*, Dkt. No. 7 at 25.  Additionally, the Debtor did not identify a non-filing spouse on *Schedule I*.  See *Schedule I: Your Income*, Dkt. No. 7 at 20.

that he had acquired an undisclosed BMW, Mr. Reppert explained that the Debtor owned the BMW

and attached a copy of the Pennsylvania Certificate of Title as proof.[13]  In light of this revelation

and the pending motion to dismiss, the Court scheduled a status conference to determine whether

she had, in fact, acquired and concealed an estate asset.[14]

Prior to the status conference, the Debtor cured her plan default by remitting the

final payment to the trustee.[15]  She also filed a response admitting that the BMW is titled in her

name, but asserting that it was purchased by her parents for the benefit of her underage daughter.[16]

This was followed by a self-styled "Affidavit under Penalty of Perjury" ("Affidavit") purportedly

signed by James and Kathy Palfrey stating that the BMW was an early sixteenth birthday gift for

their granddaughter.[17]

The Debtor did not attend the status conference, but Mr. Reppert did and offered a

preview of her defense.  He also confirmed that his daughter's name is misspelled in the *Affidavit*.

With the final plan payment completed, the chapter 13 trustee pragmatically took no position with

respect to the BMW, noting that "[t]his is, I suppose, an unusual case in the sense that no unsecured

creditors filed claims."[18]  She withdrew the motion to dismiss, but the Court nonetheless continued

the status conference in order to hear from the Debtor directly and assess her eligibility to receive

a discharge.

---

[13]    *Motion to Convert Case to Chapter 13 or, Alternatively, Dismiss Chapter 7 Case*, Case No. 21-22274-GLT, Dkt. No. 91 at ¶ 11; *Exhibit A*, Case No. 21-22274-GLT, Dkt. No. 91-1.

[14]    *Order Setting Status Conference*, Dkt. No. 60.

[15]    *Response to Trustee's Motion to Dismiss*, Dkt. No. 62.

[16]    *Response to Order Setting Status Conference*, Dkt. No. 64 at ¶¶ 1-2.

[17]    *Affidavit under Penalty of Perjury*, Dkt. No. 65.

[18]    *Audio of March 31, 2022 Hearing* at 10:30:24-10:31:45 a.m.

Days later, the Debtor filed an *Amended Schedule A/B* to disclose the BMW and listed its unencumbered fair market value as $36,000.[19]  Notably, she did not indicate that any other person had an interest in the BMW despite an explicit prompt to do so.[20]  The Debtor also failed to list the BMW's approximate mileage on the appropriate line.[21]

The omission of all general unsecured creditors from the matrix was finally uncovered during the Court's review of *Amended Schedule A/B*.[22]  Given the impact of this added wrinkle, the Court ordered the Debtor to appear in person and

> show cause why the Court should not deny [her] a discharge . . . or dismiss this case with prejudice due to her failure to (i) promptly disclose a substantial post-petition asset, (ii) properly serve her unsecured creditors, and (iii) comply with W.PA.LBR 1007-1(g).[23]

Curiously, the Debtor's written response only suggested that any "electronic filing error" was the result of "clerical error" and otherwise took no position with respect to the *Order to Show Cause*.[24] The chapter 13 trustee now supports dismissal with prejudice.[25]

The Court held an evidentiary hearing on the *Order to Show Cause* in May, 2022. From the outset, the Debtor challenged the contention that the BMW was property of the estate. She argued that neither the Bankruptcy Code nor any case state that non-monetary gifts of assets received by the debtor more than 180-days after the petition date become part of the chapter 13

---

[19]     *Amended Schedule A/B: Property*, Dkt. No. 69 at 2.

[20]     Id.  *Schedule A/B* specifically asks "[w]ho has an interest in the property?" and provides a series of check boxes, including "[a]t least one of the debtors and another."  Additionally, there is a text box to supply "[o]ther information" regarding an asset that is not otherwise called for expressly.

[21]     Id.

[22]     See Dkt. No. 14-2.

[23]     *Order to Show Cause*, Dkt. No. 70 at ¶ 1.

[24]     *Response to Order to Show Cause*, Dkt. No. 73.

[25]     *Chapter 13 Trustee's Response to Order to Show Cause*, Dkt. No. 74.

estate.[26]  In fact, counsel suggested that a contrary rule "makes no sense" and that this happens all

the time.[27]  Alternatively, the Debtor asserted that she merely holds title to the BMW in trust for

her daughter.  When pressed about the appropriate outcome for this case, she grudgingly suggested

that dismissal was preferrable to a discharge so she could file a chapter 7 case to discharge the

unsecured debt that did not receive notice in this case.[28]  Yet, to be clear, the Debtor did *not* move

to voluntarily dismiss her case.

   In support of her trust argument, the Debtor testified that her stepfather and mother,

the Palfreys, purchased each of their other two grandchildren new cars (a "truck" and a Camaro)

for their sixteenth birthdays.[29]  Her youngest daughter, for whom the BMW is allegedly held in

trust, turned 16 years old on April 23, 2022.[30]  In other words, when the BMW was acquired, the

daughter was only 14.[31]  According to the Debtor, Mr. Palfrey insisted on purchasing a vehicle

early because he is suffering from dementia and wanted an opportunity to see it enjoyed before his

symptoms worsened.[32]  The Debtor testified that she took title to the BMW pursuant to the

Palfreys' wishes with the understanding that she would transfer ownership to her daughter "when

they can."[33]

---

[26] *Audio of May 4, 2022 Hearing* at 2:35:42-2:38:57 p.m.,

[27] Id. at 2:41:11-2:42:11 p.m.

[28] Id. at 2:58:10-3:01:33 p.m.  The Court characterizes the Debtor's position as "grudging" because the primary
implication of her argument appeared to be that she should not be penalized for the Court's failure to promptly
raise the matrix deficiency.  That said, counsel ultimately acknowledged that the trustee's assertion that
creditors who lacked notice cannot be discharged is not "a bad argument."

[29] Id. at 3:03:25-3:03:39 p.m.

[30] Id. at 3:04:29-3:04:35 p.m.

[31] Id. at 3:19:53-3:20:09 p.m.

[32] Id. at 3:03:44-3:04:14 p.m.

[33] Id. at 3:04:15-3:05:01 p.m.

Despite supposedly being a gift from the Palfreys to their granddaughter, the Debtor and Mr. Reppert alone selected the vehicle and negotiated its purchase.[34] Her daughter's only input related to its color.[35] When asked why the BMW was chosen, the Debtor only offered a vague statement about its relative safety.[36] Emphasizing that the BMW is a gift, the Debtor testified that it has only been used "occasionally"—about once a month—and was otherwise stored in the garage until her daughter obtained her learner's permit.[37] She admitted, however, that other family members may have used the BMW from time to time without her knowledge.[38]

At the hearing, the Debtor could not recall how much the BMW cost, but believed it was in the "thirties."[39] She testified that the Palfreys gave them the funds to purchase the BMW and her husband paid the dealership.[40] The Debtor said that she did not know the Palfreys' financial condition, nor how they could afford such expensive gifts for each of her three children.[41] She explained that they are both retired, but Mr. Palfrey previously drove a school bus while Mrs. Palfrey worked at K-Mart until it closed.[42]

After the Debtor's testimony, Mr. Reppert took the stand ostensibly to clarify details that the Debtor could not recall or misremembered. Like his wife, he could not explain why they picked the BMW for their daughter.[43] Mr. Reppert stated that the Palfreys supplied a

---

[34] Id. at 3:06:53-3:08:14 p.m.

[35] Id.

[36] Id.

[37] Id. at 3:05:18-3:05:56 p.m., 3:10:25-3:11:05 p.m.

[38] Id. at 3:12:50-3:13:27 p.m.

[39] Id. at 3:07:34-3:07:53 p.m.

[40] Id. at 3:08:30-3:10:25 p.m.

[41] Id. at 3:15:55-3:16:15 p.m.

[42] Id. at 3:15:27-3:15:40 p.m.

[43] Id. at 3:35:23-3:35:40 p.m.

cashier's check for $40,000 payable directly to the dealership.[44]  He did not know the source of

the Palfreys' funds, but noted that Mr. Palfrey was a supervisor at Snyder's of Berlin for 30 years

before driving a school bus part-time.[45]  In any event, Mr. Reppert repeatedly and unequivocally

testified that the cashier's check covered the full purchase price of the BMW, including taxes and

fees, and that neither he nor his wife contributed funds to the transaction.[46]

At the conclusion of the hearing, the Court directed the Debtor to file a certification

of the BMW's current mileage and, in light of the seeming testimonial inconsistency, a verified

copy of the cashier's check used to purchase it.[47]  Her timely submission reflects that as of March

2022, one month prior to the daughter's sixteenth birthday, the BMW's odometer read 3,559

miles.[48]  The Debtor also filed a copy of a cashier's check from PNC Bank payable to "Bobby

Rahal" for $40,000.[49]  The Court then took the *Order to Show Cause* under advisement.

While this decision was undergoing final revisions, certain developments occurred

in Mr. Reppert's chapter 7 case that are relevant to the matter at bar.  Under Federal Rule of

Evidence 201,[50] the Court may take judicial notice of its own records.[51]  Following an examination

of Mr. Reppert conducted pursuant to Federal Rule of Bankruptcy Procedure 2004, the United

---

[44]     Id. at 3:30:00-3:32:26 p.m.

[45]     Id. at 3:32:52-3:33:43 p.m.

[46]     Id. at 3:29:15-3:29:34 p.m., 3:32:30-3:33:12 p.m., 3:34:14-3:34:52 p.m.

[47]     *Text Order*, Dkt. No. 78.

[48]     *Response to Order Dated May 5, 2022*, Dkt. No. 79 at 2.

[49]     Id. The Court presumes that "Bobby Rahal" refers to the Bobby Rahal Automotive Group that operates various automotive dealerships in Pennsylvania.

[50]     See Fed. R. Evid. 201(b).

[51]     See Cyrilla v. Eritano (In re Cyrilla), No. 18-20017-GLT, 2020 WL 96680, at *1 n.2 (Bankr. W.D. Pa. Jan. 8, 2020); U.S. Trustee v. Kubatka (In re Kubatka), 605 B.R. 339, 345 n.2 (Bankr. W.D. Pa. 2019); U.S. Trustee v. Stone Fox Capital LLC (In re Stone Fox Capital LLC), 572 B.R. 582, 592 n.3 (Bankr. W.D. Pa. 2017).

States Trustee filed a complaint seeking to deny him a discharge based on a series of false oaths.[52]

Of particular importance here, the Trustee states that Mr. Reppert testified that his sole

proprietorship paid $12,443.71 to "Bobby Rahal" in March 2021 for "for my wife, her car."[53]  The

memo line of the check reads, "Mom's Car Balance BMW."[54]  When asked if the BMW was for

his spouse, Mr. Reppert replied, "That's actually, yes, yes, but her and my daughters."[55]  As

highlighted by the Trustee, these statements stand in stark contrast to those offered in support of

his motion to convert,[56] to say nothing of his sworn testimony in this case.  In his answer, Mr.

Reppert admitted the truth of these allegations but casually explained that he previously "did not

recall that he paid the additional sum required to purchase the [BMW]."[57]

Taking this new information into account, the true purchase price of the BMW was

at least $52,443.71, substantially more than either the Debtor (in the "thirties") or Mr. Reppert

($40,000) stated under oath.  This is particularly notable because the Debtor indicated its fair

market value was only $36,000 on *Schedule A/B*.  The Court takes judicial notice of the fact that

persistent global supply chain problems over the last few years have driven vehicle prices up across

the board.  As a result, used cars are holding their value.  Based on the Debtor's testimony, the

BMW should still be in excellent condition.  As a result, it is doubtful that the BMW would have

depreciated to such a degree in a year.  Indeed, according to *Kelley Blue Book*,[58] the BMW's trade-

---

[52]    See *Complaint for Denial of Discharge under 11 U.S.C. § 727*, Adv. Pro. No. 22-2057-GLT, Dkt. No. 1.

[53]    Id. at ¶¶ 35-36.

[54]    Id. at ¶ 35; see also *Exhibit I*, Adv. Pro. No. 22-2057-GLT, Dkt. No. 1-9.

[55]    *Complaint for Denial of Discharge under 11 U.S.C. § 727*, Adv. Pro. No. 22-2057-GLT, Dkt. No. 1 at ¶ 36.

[56]    Id. at ¶¶ 38-39.

[57]    *Answer to Complaint for Denial of Discharge under 11 U.S.C. § 727*, Adv. Pro. No. 22-2057-GLT, Dkt. No.
1 at ¶¶ 35-39.

[58]    Judicial consideration of the valuation evidence found in these commercial guides such as *Kelley Blue Book*
is a well-accepted practice.  See In re Henry, 457 B.R. 402, 408 n.9 (Bankr. E.D. Pa. 2011).

in value would range between $41,472-$44,515.[59]   While the value of the BMW exceeds the scheduled claims either way, the discrepancy bears on her credibility and the attention she gave an amended schedule at the heart of an ongoing dispute.

## II.   JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## III.   DISCUSSION

### A.   The Completion of Plan Payments did not Moot the *Order to Show Cause*

From the outset, the Court must address the elephant in the room: the Debtor has completed all payments under her confirmed chapter 13 plan.   To be sure, the completion of chapter 13 payments is an important benchmark under the Bankruptcy Code.[60]   Once this occurs, no further modifications of the plan are possible.[61]   Additionally, subject to certain exceptions,[62] "as soon as practicable after completion by the debtor of all payments under the plan . . . the court

---

[59]   This price range is based on the BMW's VIN, reported mileage, and color.   See https://www.kbb.com/bmw/2-series/2021/m235i-xdrive-gran-coupe-sedan-4d/?vehicleid=453277&mileage=3600&vin=wba13al01m7g65273&modalview=false&intent=trade-in-sell&pricetype=trade-in&condition=excellent&options=9969760%7ctrue%7c9969758%7ctrue%7c9969759%7ctrue%7c9969777%7ctrue

[60]   Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as thereafter amended, 11 U.S.C. § 101, *et seq*. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[61]   11 U.S.C. § 1329(a).

[62]   See 11 U.S.C. §§ 1328(a) (debtor under a domestic support order must certify all domestic support obligations due on or before the date of the certification have been paid as a precondition to discharge); (f) ("the court shall not grant a discharge . . . if the debtor has received a discharge--(1) in a case filed under chapter 7, 11, or 12 of this title during the 4-year period preceding the date of the order for relief under this chapter, or (2) in a case filed under chapter 13 of this title during the 2-year period preceding the date of such order."); (g) ("The court shall not grant a discharge under this section to a debtor unless after filing a petition the debtor has completed an instructional course concerning personal financial management described in section 111.").

*shall* grant the debtor a discharge" under section 1328(a).[63]    The Court has previously acknowledged that "shall" ordinarily reflects a statutory command not subject to court discretion.[64] With that in mind, the Court is aware of several cases which hold that a court loses discretion to dismiss a case for bad faith and must enter a discharge after the completion of plan payments.[65] Ultimately, the Court disagrees because these courts underestimate the magnitude of absurd results wrought by a too literal interpretation.[66]

Before delving into this statutory debate, the Court observes that the Debtor has not filed a certificate evidencing her completion of a personal financial management course.[67] Technically, the discharge hinges the completion of an instructional course rather than the filing of the certificate,[68] but the Court is not obliged to act without one.[69]  This, however, is a procedural failing that could be remedied.  For that reason, and because the present inability to enter a discharge would not appear to be a meaningful distinction under these cases, the Court must press on with its analysis.

There are four published decisions that expressly hold that a motion to dismiss for bad faith is rendered moot by the completion of payments under a confirmed chapter 13 plan.[70]  In

---

[63]    11 U.S.C. § 1328(a) (emphasis added).

[64]    See Cenk v. Cenk (In re Cenk), 612 B.R. 323, 326 (Bankr. W.D. Pa. 2020) (citing Anderson v. Yungkau, 329 U.S. 482, 485 (1947)).

[65]    See In re Frank, 638 B.R. 463 (Bankr. D. Colo. 2022); In re Holman, 567 B.R. 599 (Bankr. D. Kan. 2017), aff'd, Davis v. Holman (In re Holman), 594 B.R. 769 (D. Kan. 2018); In re Parffrey, 264 B.R. 409 (Bankr. S.D. Tex. 2001).

[66]    For the sake of being complete, the Court addresses this issue even though the Debtor did not raise it.

[67]    See 11 U.S.C. § 111; see also Fed. R. Bankr. P. 1007(c).

[68]    Id.

[69]    11 U.S.C. § 1328(g)(1).

[70]    While a fifth decision from the United States Bankruptcy Appellate Panel for the Eighth Circuit is also associated with this proposition, a closer examination reveals the case only supports the unremarkable idea that *entry of a discharge* will render a pending motion to dismiss moot.  See Forbes v. Forbes (In re Forbes), 218 B.R. 48, 50-52 (B.A.P. 8th Cir. 1998).

each case, the court held that the plain language of section 1328(a) unequivocally mandates the entry of a discharge once the debtor completes all payments under the plan.[71] They reason that this specific command supersedes the court's general discretionary authority ("may . . . dismiss") under section 1307(b).[72] Remarkably, despite egregious fact patterns, three out of four courts stopped their analysis at the plain meaning of "shall." Only the most recent decision, *In re Frank*, considered Congressional intent beyond section 1328(a).

The facts of *In re Frank* are par for the course, which is to say bad. The debtors' confirmed plan obligated them to pay approximately $10,000 over 39 months, yielding no dividend to their unsecured creditors.[73] About a month before completing their payments, the debtors inadvertently tipped off the trustee to a previously undisclosed personal injury claim that they settled for $67,000.[74] Before the trustee moved to dismiss based on their non-disclosure of the asset, the debtors tendered their final payment.[75]

In a thoughtful analysis, the court in *In re Frank* found that although there is no time limit for seeking dismissal under section 1307(c), such relief was nonetheless constrained by the overall statutory scheme. It started with the premise that "other sanctions for debtor misconduct have express statutory time limitations . . . reflect[ing] a balancing of interests."[76] The court pointed to section 1330, which permits revocation of a confirmation order procured by fraud only within six months of entry,[77] noting that "[a]fter six months, a countervailing policy of

---

[71]   See In re Frank, 638 B.R. at 468; In re Holman, 567 B.R. at 614; aff'd, 594 B.R. at 777; In re Parffrey, 264 B.R. at 414.

[72]   See In re Holman, 594 B.R. at 778; In re Frank, 638 B.R. at 471.

[73]   In re Frank, 638 B.R. at 465.

[74]   Id.

[75]   Id.

[76]   Id. at 467.

[77]   11 U.S.C. § 1330(a).

promoting finality takes greater precedence."[78]   It then found further incidences of the statute

invoking a "principle of finality," such as section 1329(a)'s prohibition on modifications once

payments under a confirmed plan have been completed.[79]   Shifting to section 1328(a), the court

found that the completion of payments also triggers the entry of the discharge, for which there is

no exception for fraud or bad faith conduct.[80]   Instead, section 1328(e) provides for the revocation

of the discharge "only if" it was obtained through fraud "and the requesting party did not know of

such fraud until after such discharge was granted."[81]   Even then, the court observed, principles of

finality limit revocation to fraud discovered between entry of the discharge and its one year

anniversary.[82]   Recognizing that the two revocation provisions (sections 1330(a) and (1328(e))

leave "a pretty wide loophole for the dishonest debtor" since neither address fraud discovered more

than six months after the confirmation order but before the discharge, the court concluded that

"these two statutes signal that . . . after a certain period of time, the principle of finality must

outweigh the policy of rooting out abusers of the bankruptcy system."[83]

Like the other cases, *In re Frank* rests on the "clear mandate laid out in section

1328(a)" prevailing over the "more general" section 1307(c).[84]   And as the court correctly notes,

the only other published decision to reach a contrary result dismissed the case without analyzing

section 1328.[85]   Yet *In re Frank* distinguishes itself by anchoring its interpretation to a defined

---

[78]    In re Frank, 638 B.R. at 467.

[79]    Id.

[80]    Id. at 468.

[81]    Id. (quoting 11 U.S.C. § 1328(e)(1)-(2)).

[82]    Id. (citing 11 U.S.C. § 1328(e)).

[83]    Id.

[84]    Id. at 471.

[85]    See, e.g., In re Wheeler, 503 B.R. 694 (Bankr. N.D. Ind. 2013).

intent: "Congress favors finality over the need to address bad conduct" after the "narrow time periods" provided in the statute.[86]   This enabled the court to characterize its plain reading of sections 1328(a) and 1307(c) as consonant with the legislative purpose, despite being "a difficult pill to swallow."[87]   Respectfully, the Court can only agree that this result is difficult to swallow.

The Court begins with the well-established rules of statutory construction.   The Supreme Court of the United States instructs that "when the statute's language is plain, the sole function of the courts—*at least where the disposition required by the text is not absurd*—is to enforce it according to its terms."[88]   Indeed, "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"[89]   In the event of an absurd result, "the intention of the drafters, rather than the strict language, controls."[90]   "The starting point in discerning congressional intent is the existing statutory text,"[91] and "we assume that . . . Congress said what it meant."[92]

Again, the Court concedes that section 1328(a) plainly commands the entry a discharge as soon as is practicable after a debtor's completion of payments under the plan.[93]   And, in *In re Cenk*, the Court previously resolved a similar textual dispute by holding section 1307(b)'s

---

[86]   In re Frank, 638 B.R. at 471.

[87]   Id. at 470.

[88]   Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000) (internal quotation marks omitted) (emphasis added).

[89]   United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)).

[90]   United States v. Ron Pair Enterprises, Inc., 489 U.S. at 242.

[91]   Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004).

[92]   United States v. LaBonte, 520 U.S. 751, 757 (1997).

[93]   11 U.S.C. § 1328(a).  The Court notes that the statutory phrase "completion of payments" does not consider the possibility that a chapter 13 plan provisions may require material non-monetary performance.  Read literally, section 1328(a) would seemingly excuse any such defaults once the final plan payment is tendered.

"shall dismiss" trumps section 1307(c)'s "may convert" language, providing chapter 13 debtors an "absolute right" to dismiss their case.[94]  But the Court can accept that Congress' desire to ensure chapter 13 is volitional produced a statutory escape hatch for all debtors, including those seeking to avoid the undesirable consequences of their bad faith.  After all, this outcome still vindicates the system by denying bad faith debtors bankruptcy relief and permitting its future availability to be restricted as a sanction.[95]  In contrast, a general preference for "finality" seems a weak reason to reward bad faith debtors with a discharge—the holy grail of bankruptcy—when their manipulations are discovered or, worse, *disclosed* during a statutory interregnum.

        The Court does not deny that Congress embedded principles of finality into the Code.  Certainly, the one-year time limit for seeking revocation of a discharge exemplifies how finality conceptually underpins the judicial system as a whole: "all litigation must end in due course and reach a resolution that cannot be disturbed."[96]  Admittedly, section 1330(a) embodies similar principles in two ways.  First, as affirmed by the United States Court of Appeals for the Third Circuit, fraud is the only basis to revoke a confirmation order, taking all other objections off the table.[97]  Second, revocation must be sought "within 180 days after the date of the entry of" the confirmation order, otherwise even an "order . . . procured by fraud" cannot be upset.[98]  So section 1330(a) unquestionably bolsters the finality of the confirmation order, but that is all it does.  The sanctity of a confirmation order neither bars the court from dismissing a case due to a debtor's bad

---

[94]    In re Cenk, 612 B.R. at 328.  In fairness, the Court lamented this outcome as "disconcerting," and queried whether this reading was "too literal" or "whether there is ever room for a different result."  Id. at 329.

[95]    See In re Ross, 858 F.3d 779, 784-85 (3d Cir. 2017) (bankruptcy court has the discretion to address bad faith conduct by enjoining future filings).

[96]    Butko v. Ciccozzi (In re Butko), 624 B.R. 338, 366 (Bankr. W.D. Pa. 2021).

[97]    Branchburg Plaza Assocs., LP v. Fesq (In re Fesq), 153 F.3d 113 (3d Cir. 1998).

[98]    11 U.S.C. § 1330(a).

faith,[99] nor prevents a party in interest from compelling a modification of the confirmed plan when

undisclosed assets are discovered.[100]    Thus, while the confirmation order is final, the Code

nonetheless contemplates that it may be undermined and rendered moot by these alternative

mechanisms.    The lesson here is that "principles of finality" must be understood and weighed

within their statutory context.

Considering the Code as a whole, there are far more obvious and important

overarching Congressional interests at play than finality.    The Supreme Court has repeatedly

recognized that

> a central purpose of the Code is to provide a procedure by which certain
> insolvent debtors can reorder their affairs, make peace with their creditors,
> and enjoy "a new opportunity in life with a clear field for future effort,
> unhampered by the pressure and discouragement of preexisting debt." But
> in the same breath that we have invoked this "fresh start" policy, we have
> been careful to explain that *the Act limits the opportunity for a completely
> unencumbered new beginning to the "honest but unfortunate debtor."*[101]

Limiting relief to the "honest but unfortunate debtor" is so enshrined in the Bankruptcy Code that

Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA")[102] when a perceived increase in serial and abusive filings seemingly threatened that

foundation.[103]    Among other things, the BAPCPA amendments introduced "means testing" as a

screening mechanism to ensure bankruptcy relief is "needs-based" and that "debtors repay

---

[99]    11 U.S.C. § 1307(c).

[100]    11 U.S.C. § 1329(a).

[101]    Grogan v. Garner, 498 U.S. 279, 286–8, (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934));
see Lamar, Archer & Cofrin, LLP v. Appling, 138 S. Ct. 1752 (2018); Marrama v. Citizens Bank of
Massachusetts, 549 U.S. 365, 367 (2007); Cohen v. de la Cruz, 523 U.S. 213, 217 (1998).

[102]    Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, 11
U.S.C. § 101, *et seq.*

[103]    H.R. REP. 109-31(I), 2, 2005 U.S.C.C.A.N. 88, 89.

creditors the maximum they can afford.[104]  These reforms also: replaced the presumption in favor of granting the debtor a discharge with a mandatory presumption of abuse triggered by the means test; restricted the relief available to serial filers; imposed a minimum "applicable commitment period" on chapter 13 debtors; and reduced the scope of the chapter 13 discharge.[105]  In sum, Congress made manifest its intent to curtail abusive filings and limit bankruptcy relief to the "honest but unfortunate debtor."  That is the lens through which the Court must assess the rationality of a literal interpretation of section 1328(a) under these circumstances.

From this perspective, the idea that Congress provided a "wide loophole for the dishonest debtor" should trigger great skepticism.  *In re Frank* seemingly overlooked that because its reasoning appears tainted by confirmation bias.  Put simply, the court perceived this statutory "loophole" or "gap" because it fixated on the combination of sections 1330(a) and 1328(e) to the exclusion of everything else.  It is hardly surprising that the court found a common signal in favor of finality since it only considered the interplay of two similar provisions that clearly embody that principle.  In reality, much of this purported gap is filled by other provisions that cover debtor fraud and misconduct.  Although *In re Frank* seems non-committal on this point,[106] compulsory plan modification and dismissal are indisputably within the statutory bounds before the completion of payments.  Factoring that into the equation, the gap is neither so wide as to have been obvious to lawmakers, nor does it so strongly or uniformly reflect the primacy of finality.

---

[104]    H.R. REP. 109-31(I), 2, 2005 U.S.C.C.A.N. 88, 89.  <u>See</u> 11 U.S.C. § 707(b).

[105]    H.R. REP. 109-31(I), 13-15, 2005 U.S.C.C.A.N. 88, 99-101.

[106]    In fact, the court queried without answering: "If Congress saw fit to limit actions to expose fraud to six months, then can a party merely circumvent this statutory prohibition by filing a dismissal motion instead?" <u>In re Frank</u>, 638 B.R. at 467.  The court acknowledged that "[i]t is certainly true that dismissal motions are not limited to the six-month period post-confirmation," but again questioned whether this meant "there really *no* limit to the time for seeking dismissal in chapter 13?"  <u>Id.</u> (emphasis in original).

That said, there is a loophole created by reading section 1328(a) to trump all other provisions and it is both arbitrary and leads to absurd results.  Essentially, if the rule is that a court is powerless to punish bad faith conduct after payments are completed, then debtors whose bad faith is revealed prior to the entry of discharge can avoid all negative consequences so long as there is insufficient time for anyone to do anything about it.  Unlike section 1328(e), which sets a deadline for the *initiation* of revocation proceedings,[107] this reading of section 1328(a) would require that any move against the debtor (such as a motion to dismiss) be *concluded* prior to the completion of payments.[108]  Worse than a shot clock,[109] the final plan payment would moot even a timely attempt to hold the debtor accountable.  A debtor also enjoys several innate procedural advantages in this context because the burden to discover misconduct is on a moving party, factual disputes take time to resolve, and payments are one-sided.[110]  Thus, while it may be reasonable for Congress to insist that known fraud or misconduct be addressed prior to the discharge or not at all,

---

[107]    11 U.S.C. § 1328(e) ("On *request* of a party in interest before one year after a discharge under this section is granted . . .").

[108]    Two circuits have held that the completion of payments under a confirmed chapter 13 plan does not prevent a court from approving a request for modification filed prior to the final payment.  See Germeraad v. Powers, 826 F.3d 962 (7th Cir. 2016); Meza v. Truman (In re Meza), 467 F.3d 874, 877 (5th Cir. 2006).  They reason this result is not at odds with section 1328(a) because section 1329(b)(2) states that a plan modification "becomes the plan unless . . . disapproved."

[109]    A shot clock is a countdown timer used in a variety of games, including basketball, setting the amount of time a team may possess the object of play, such as a ball, before attempting to score a goal.  See SHOT CLOCK, *Merriam-Webster Dictionary* (2022), https://www.merriam-webster.com/dictionary/shot%20clock

[110]    Without diving further down the rabbit hole than is necessary, it is worth noting that there is potential for even greater mischief if the debtor tries to pay off the plan's monetary obligation early.  Suffice it to say there is some authority supporting a debtor's ability to do so, but it is unclear how prevalent this practice remains since BAPCPA's introduction of the "applicable commitment period."  See, e.g., In re Refosco, No. BR 11-27174-JAD, 2013 WL 3489923, at *1 (Bankr. W.D. Pa. July 9, 2013), rev.'d, Winnecour v. Refosco, No. 2:13-cv-01219, Dkt. No. 149 (W.D. Pa. April 9, 2014) (citing Pliler v. Stearns, 747 F.3d 260 (4th Cir. 2014), In re Flores, 735 F.3d 855, 856 (9th Cir. 2013), Baud v. Carroll, 634 F.3d 327, 338 (6th Cir. 2011), Whaley v. Tennyson, 611 F.3d 873, 880 (11th Cir.2010), and Coop v. Frederickson, 545 F.3d 652, 660 (8th Cir. 2008)).  Obviously, if a debtor can immediately pay off a chapter 13 plan upon the discovery of fraud or misconduct it would be nearly impossible to prevent abuse under this interpretation of section 1328(a).  Indeed, debtors would be encouraged to use the tainted fruits to achieve this outcome if it meant they could retain more through subterfuge.

treating the completion of payments as the final buzzer signaling an abrupt default victory for a bad faith debtor is plainly an unfair and irrational outcome.

But the full implications of construing sections 1307(c) and 1328(a) in this manner are far more distasteful than a debtor running out the clock on a pending contested matter.  The "opportunity for mischief,"[111] as apparently downplayed by *In re Frank*, actually empowers a dishonest debtor to immunize their discharge by disclosing misconduct prior to its entry.  A well-timed confession means that the trustee or a party in interest could neither block entry of the discharge by moving for dismissal, nor later seek its revocation because knowledge of the fraud came too early.  Section 1328(e)(2) would be rendered a nullity.  And, as a practical matter, this result would not only condone the avowed misconduct, but finalize the manipulation by rewarding the bad faith debtor with an undeserved discharge on the cheap.  It is inconceivable that Congress, whose stated purpose was to limit bankruptcy relief to the "honest but unfortunate debtor," would countenance an interpretation of the Code that regularly discharges the deceitful but strategically unscrupulous debtor.  Even a death bed confession requires some degree of repentance to obtain absolution.

The cases demonstrate that these concerns are not hypothetical.  As previously explained, the trustee in *In re Frank* promptly moved to dismiss upon learning that the debtors concealed a substantial personal injury settlement, but could not beat the debtors' final payment under a plan that paid nothing to unsecured creditors.[112]  In *In re Parffrey*, the debtor short circuited a motion to dismiss and obtained a discharge by completing his final four plan payments early once it was discovered that he had not filed any post-petition tax returns.[113]  Notably, the court

---

[111]     In re Frank, 638 B.R. at 468.

[112]     In re Frank, 638 B.R. at 465.

[113]     In re Parffrey, 264 B.R. at 411.

found that particularly galling because the case was prompted by the debtor's failure to pay prepetition income taxes, which he likely paid off by diverting funds from postpetition tax obligations.[114]  In *In re Holman*, the court found that the debtors engaged in a pattern of "misreporting or conceal[ing] income, new debt, and asset acquisition and disposition from the Trustee" while using "chapter 13 to drastically modify their home mortgage loans."[115]  Despite "flout[ing] their duties" and "violat[ing] both their plan and confirmation order,"[116] the debtors were granted a discharge when the court realized the trial on the motions to dismiss filed by the chapter 13 trustee and the United States Trustee occurred three months after the completion of payments.[117]  The district court affirmed, observing "it is an unsatisfying result as it appears that Debtors gamed the system to their advantage."[118]

Ultimately, the Court finds that a plain reading of section 1328(a) in this context would absurdly incentivize bad faith conduct and undermine the foundational principles of the Code.  Given that the Supreme Court affirmed the absence of an "Oops" defense to the concealment of assets in *Marrama v. Citizens Bank of Massachusetts*,[119] there cannot possibly be a "Gotcha!" defense for those who lay bare their sins at the last minute.  Rewarding cheaters would also diminish the accomplishments of the honest debtors who work hard to earn a discharge.  Accordingly, the Court holds that section 1328(a) does not bar dismissal under section 1307(c) once plan payments have been completed.

---

[114]  Id. at 414.

[115]  In re Holman, 567 B.R. at 611.

[116]  Id. at 600.

[117]  Id. at 614.  Apparently, the final payment was made timely while the parties were conducting discovery.  Id. at 608.

[118]  In re Holman, 594 B.R. at 778.

[119]  Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 369–70, 127 S. Ct. 1105, 1109, 166 L. Ed. 2d 956 (2007).

Alternatively, even if that holding were to be found clearly erroneous, there is still another reason why the completion of payments *in this case* would not have automatically rendered the *Order to Show Cause* moot.  Recall that the Debtor's final plan payment was late.  In *In re Klaas*, the Third Circuit affirmed this Court's conclusion that "bankruptcy courts have discretion to grant a brief grace period and discharge debtors who cure an arrearage in their payment plan shortly after the expiration of the plan term."[120]  The Third Circuit also provided a non-exhaustive list of factors that a bankruptcy court should consider in the exercise of its discretion:

> (1) whether the debtor substantially complied with the plan, including the debtor's diligence in making prior payments; (2) the feasibility of completing the plan if permitted, including the length of time needed and amount of arrearage due; (3) whether allowing a cure would prejudice any creditors; (4) whether the debtor's conduct is excusable or culpable, taking into account the cause of the shortfall and the timeliness of notice to the debtor; and (5) the availability and relative equities of other remedies, including conversion and hardship discharge.[121]

While the Court cannot deny that the Debtor's default was modest and cured quickly, the equities do not militate in favor of granting a grace period.  As will be explained below, the Court finds that the Debtor has not established her good faith, rendering a discharge unfairly prejudicial to her creditors.  Put simply, granting this debtor an extension under these circumstances would not "further the goals of the Bankruptcy Code."[122]

B.      The BMW is Property of the Estate

Generally, the commencement of a case under the Bankruptcy Code creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case" as well as "[a]ny interest in property that would have been property

---

[120]     In re Klaas, 858 F.3d 820, 823 (3d Cir. 2017).

[121]     Id. at 832.

[122]     Id. at 833.

of the estate . . . that the debtor acquires . . . within 180 days" of the petition date.[123]  Under chapter

13, however, property of the estate also includes "all property of the kind specified in [section 541]

that the debtor acquires *after the commencement of the case* but before the case is closed,

dismissed, or converted . . . ."[124]  Thus, *all legal and equitable interests* of the debtor in property

acquired during the case—such as a car—is property of the estate and "must be promptly reported

to the Court and trustee."[125]

Importantly, a debtor's responsibility to disclose assets does not end at plan

confirmation.[126]  Nor is that continuing duty an empty gesture or mere procedural technicality.  In

this district, property of the estate does not re-vest in the debtor until the completion of the plan.[127]

As the Court emphasized in *In re Zvoch*, "the terms of the plan may be revisited at any time before

the completion of payments.  And just like the debtor, the trustee and unsecured creditors have the

right to seek a plan modification."[128]  The takeaway, succinctly put by the United States Court of

Appeals for the Eleventh Circuit, is that:

> [i]f postconfirmation assets were not subject to disclosure, modifications for
> increased payments would be rare because few debtors would voluntarily
> disclose new assets, and the trustee and creditors would be unlikely to obtain
> this information from sources other than the debtor.[129]

Thus, creditors who are not being paid in full have a keen interest in assets acquired postpetition.

---

[123]    11 U.S.C. § 541(a)(1), (5)

[124]    11 U.S.C. § 1306(a)(1) (emphasis added).

[125]    Zvoch v. Winnecour (In re Zvoch), 618 B.R. 734, 739 (Bankr. W.D. Pa. 2020).

[126]    Id.

[127]    See PAWB Local Form 10 at § 7.1 (12/17).

[128]    In re Zvoch, 618 B.R. at 739 (citing 11 U.S.C. § 1329(a)).  Notably, Attorney Spyra was also debtor's counsel
in the *Zvoch* case.

[129]    Waldron v. Brown (In re Waldron), 536 F.3d 1239, 1245 (11th Cir. 2008)

That all said, property of the estate does not include "[p]roperty in which the debtor holds . . . only legal title and not an equitable interest."[130]  Put simply, property held in trust for another is not property of the estate.[131]  But the burden of proving a trust relationship falls on the party seeking to exclude an asset from the bankruptcy estate.[132]

By virtue of the Debtor's undisputed legal title, the BMW is presumptively property of her bankruptcy estate.  Her alternative argument that postpetition non-monetary gifts of assets do not fall within the purview of section 1306(a)(1) is plainly wrong.[133]  Therefore, the onus was on the Debtor to prove her primary theory: that she holds the BMW in trust for her daughter. Ultimately, the evidence does not preponderate in her favor.

Without mincing words, the idea that a luxury vehicle was purchased for the use of a 14-year-old who cannot drive is inherently suspect.  That is the perception the Debtor needed to overcome to prevail.  Yet by and large, her testimony was self-serving and lacking salient detail.

---

[130]    11 U.S.C. § 541(d).

[131]    See City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95 (3d Cir. 1994); Total Restoration Serv. v. Poole (In re Poole), No. 15-20746-TPA, 2015 WL 13855997, at *5 (Bankr. W.D. Pa. Sept. 9, 2015); Smithfield Trust Co. v. Pitchford (In re Pitchford), 410 B.R. 416, 423 (Bankr. W.D. Pa. 2009); Brockway Pressed Metals, Inc. v. Eynon Associates, Inc. (In re Brockway Pressed Metals, Inc.), 363 B.R. 431, 440 (Bankr. W.D. Pa. 2007), subsequently aff'd sub nom. In re Brockway Pressed Metal, Inc., 304 F. App'x 114 (3d Cir. 2008); Elliot v. Kiesewetter (In re Kiesewetter), 337 B.R. 75, 78 (Bankr. W.D. Pa. 2006); Electric M&R, Inc. v. Aultman (In re Aultman), 223 B.R. 481, 484 (Bankr. W.D. Pa. 1998); Dal-Tile Corp. v. Reitmeyer (In re Buono), 119 B.R. 498, 501 (Bankr. W.D. Pa. 1990).

[132]    See Gulfstream Aerospace Corp. v. Calascibetta (In re Strategic Techs., Inc.), 142 F. App'x 562, 566 (3d Cir. 2005); Sender v. The Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Invs. Assocs., Inc.), 48 F.3d 470, 474 (10th Cir. 1995); Goldberg v. New Jersey Lawyers' Fund for Client Prot., 932 F.2d 273, 280 (3d Cir. 1991); Baker v. Penton (In re Penton), No. 12-12167-WHD, 2013 WL 1208748, at *3 (Bankr. N.D. Ga. Feb. 15, 2013); Wachovia Bank of GA v. Vacuum Corp. (In re Vacuum Corp.), 215 B.R. 277, 281 (Bankr. N.D. Ga. 1997); Jones v. Delta Ctr., Inc. (In re Alpha Ctr., Inc.), 165 B.R. 881, 886 (Bankr. S.D. Ill. 1994); In re Farmers & Feeders, Inc., No. 93-30770, 1994 WL 1887490, at *2 (Bankr. D.N.D. Dec. 8, 1994), subsequently aff'd, 94 F.3d 648 (8th Cir. 1996); Custer v. Dobbs (In re Dobbs), 115 B.R. 258, 271 (Bankr. D. Idaho 1990); Argus Mgmt. Corp. v. N.E. Mut. Life Ins. Co. (In re Hillcrest Foods, Inc.), 31 B.R. 563, 564 (Bankr. D. Me. 1983).

[133]    To the extent that Debtor's counsel suggests that chapter 13 debtors regularly acquire substantial unencumbered assets during the pendency of their cases and neither report it nor even consider it property of the estate, *that is a major problem*.

Meanwhile, Mr. Reppert's testimony was undermined (to the extent not refuted outright) by his subsequent admission that supplied additional funds for the purchase of the BMW. Perhaps the most telling consideration is that neither of them could explain why they chose the BMW in the first place.

Little was offered to corroborate their story, and what was raises more questions than are answered. The *Affidavit* allegedly signed by the Palfreys is so obviously problematic that it weighs against the Debtor's credibility. It lacks an attestation clause indicating that it was, in fact, signed under the penalty of perjury, their granddaughter's name is misspelled, and, of course, Mr. Palfrey's signature is concerning since the alleged motivation for the early gift was his declining cognitive health.[134] In a similar vein, the cashier's check obscures, rather than clarifies, the ultimate source of funding for the purchase and does not prove the Palfreys paid for the BMW.[135] Finally, the BMW's current mileage (3,559) is inconsistent with the Debtor's assertion that it sat in the garage and was rarely used.[136] Averaging the mileage over 14 months suggests that the BMW was driven over 250 miles per month before the daughter even had her learner's permit.

In the end, the Debtor did not carry her burden to demonstrate that her interest in the BMW was solely legal and not equitable. The testimony elicited was self-serving, contradictory, and unsubstantiated. No compelling evidence established that anyone other than the Debtor and her husband were involved in the purchase of the BMW or that it was held in trust for their daughter. To be blunt, the Debtor's offering was so anemic that the Court can only

---

[134]   *Affidavit under Penalty of Perjury*, Dkt. No. 65.

[135]   *Response to Order Dated May 5, 2022*, Dkt. No. 79 at 3.

[136]   *Response to Order Dated May 5, 2022*, Dkt. No. 79 at 2. Like the cashier's check, the BMW's current mileage was supplied post-evidentiary hearing at the direction of the Court. See *Text Order*, Dkt. No. 78.

conclude that either she did not take the *Order to Show Cause* seriously or she was unable to bolster her testimony with evidence because her story was fabricated.[137]  Either way, the Court finds that the BMW is property of the estate.

      C.      <u>Dismissal is Warranted Under Section 1307(c)</u>

The bankruptcy court, after notice and a hearing, may dismiss a chapter 13 case or covert it to chapter 7 for "cause" if it "is in the best interest of creditors and the estate."[138]  "Cause" is not defined, but section 1307(c) provides a non-exhaustive list of examples.[139]  It is also well-established that a lack of good faith, or the existence of bad faith, is sufficient cause for dismissal under section 1307(c).[140]  The United States Court of Appeals for the Third Circuit instructs that "the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances."[141]  According to the Third Circuit, the following factors may inform an inquiry into a chapter 13 debtor's good faith:

    (1) the nature of the debt;

    (2) the timing of the petition;

    (3) how the debt arose;

    (4) the debtor's motive in filing the petition;

    (5) how the debtor's actions affected creditors;

    (6) the debtor's treatment of creditors both before and after the petition was filed; and

---

[137]    Although the Debtor never raised this argument, the Court queries whether she and counsel believed that her completion of plan payments rendered the non-disclosure issue moot.

[138]    11 U.S.C. § 1307(c).

[139]    <u>See</u> 11 U.S.C. § 1307(c)(1)-(11).

[140]    <u>See</u> <u>Marrama v. Citizens Bank of Massachusetts</u>, 549 U.S. 365, 373, 127 S. Ct. 1105, 1111, 166 L. Ed. 2d 956 (2007); <u>In re Lilley</u>, 91 F.3d 491, 496 (3d Cir. 1996).

[141]    <u>In re Lilley</u>, 91 F.3d 496.

(7) whether the debtor has been forthcoming with the bankruptcy court and the creditors.[142]

Given these considerations, the concealment of an asset is typically viewed as indicative of bad faith.[143]

With the Court having found that the BMW is property of the estate, it fell to the Debtor to establish her good faith in the face of her nondisclosure.[144]  Curiously, she did not offer, and counsel did not elicit, any testimony to explain why she was not forthcoming about the BMW's existence.  Any justification implicit in the trust narrative fails because the Court does not find that she was incorrect about the BMW being held in trust, but rather that her story is incredible.  Certainly, this factor does not weigh in her favor.

The impact of the BMW's concealment on creditors is measured in terms of materiality and prejudice.  The issue of materiality is easily settled since she acknowledges that it has an unencumbered fair market value of at least $36,000.[145]  Notwithstanding the peculiar circumstances of this case, there is also clearly prejudice.

The Court starts with the premise that any general unsecured claims would have been entitled to a pro rata share of the BMW's value.  Since she scheduled nonpriority unsecured claims totaling $29,150.43,[146] it is fair to assume these claims exist.[147]  Had those creditors filed

---

[142]    Id. (quoting In re Love, 957 F.2d 1350, 1357 (7th Cir. 1992)) (quotation marks omitted); see In re Myers, 491 F.3d 120, 125 (3d Cir. 2007); G6 Hospitality Franchising LLC v. Zaver (In re Zaver), 520 B.R. 159, 165 (Bankr. M.D. Pa. 2014).

[143]    See Perlin v. Hitachi Cap. Am. Corp., 497 F.3d 364, 373 (3d Cir. 2007); Innovative Bldg. Solutions, LLC v. Moser (In re Moser), 628 B.R. 756, 767 (Bankr. W.D. Pa. 2021); In re Gutierrez, 528 B.R. 1, 24 n.14 (Bankr. D. Vt. 2014); G6 Hospitality Franchising LLC v. Zaver (In re Zaver), 520 B.R. 159, 166 (Bankr. M.D. Pa. 2014); In re Marks, 174 B.R. 37, 40 (E.D. Pa. 1994).

[144]    See In re Zaver, 520 B.R. at 165.

[145]    Amended Schedule A/B: Property, Dkt. No. 69 at 2.

[146]    Schedule E/F: Creditors Who Have Unsecured Claims, Dkt. No. 7 at 13-17.

[147]    After all, the Debtor's schedules were signed under the penalty of perjury.  See U.S. Tr. v. Harms (In re Harms), 612 B.R. 288, 296 (Bankr. W.D. Pa. 2020) ("the Bankruptcy Code requires debtors to file

corresponding proofs of claim, a liquidation analysis would have required the plan to pay them in full to be confirmed.[148]   Obviously, that is a far better outcome than the 0% dividend the Debtor provided in her confirmed chapter 13 plan.[149]   Thus, the failure to disclose the BMW was at least theoretically prejudicial.

Admittedly, no unsecured creditors filed proofs of claim in this case.   Filing a proof of claim is a prerequisite to both having an allowed claim and receiving a distribution under a chapter 13 plan.[150]   With no allowed general unsecured creditors to pay, the value of the BMW was seemingly unnecessary for the completion of the plan.   From this perspective, there might appear to have been no actual prejudice.   Yet therein lies the rub: it is undisputed that no unsecured creditors were given notice or an opportunity to file proofs of clam since none were listed on the creditor's matrix.[151]   As a result, the potential for prejudice actually runs deeper because the Debtor also failed to comply with one of her most basic duties under the Bankruptcy Code and Rules.[152] This case should have dismissed long ago for this reason alone.[153]   In any event, the Debtor's failure to be forthcoming about her bankruptcy is another factor in favor of dismissal.

---

[schedules] which must be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746.43 In other words, schedules are executed under the penalty of perjury."); Fraser v. CitiMortgage, Inc. (In re Fraser), 599 B.R. 830, 837 (Bankr. W.D. Pa. 2019) ("it is the Debtor's duty to file accurate schedules and value his assets correctly. Debtor completed the schedules, as is his responsibility under 11 U.S.C. § 521(a)(1)(B)(i), which were signed under penalty of perjury.").

[148]   See 11 U.S.C. § 1325(a)(4).

[149]   *Chapter 13 Plan Dated September 17, 2019*, Dkt. No. 48-1.

[150]   See 11 U.S.C, §§ 502(a), (1325(a)(4); Fed. R. Bankr. P. 3002(a).

[151]   See Dkt. No. 14-1.  It is unclear whether this omission was intentional or not, but the outcome would be the same either way.

[152]   See 11 U.S.C. § 521(a)(1)(A); Fed. R. Bankr. P. 1007(a)(1).

[153]   The Debtor's case was not automatically dismissed under section 521(i)(1) because she (or perhaps more accurately, her counsel) technically complied with the requirement by filing a list of creditors, albeit one that was patently defective by omitting nearly all of them.  Nevertheless, the failure to timely file a complete matrix that affords notice to all creditors would otherwise constitute an "unreasonable delay by the debtor that is prejudicial to creditors" and grounds for dismissal.  See 11 U.S.C. § 1307(c)(1).

If the case had proceeded properly, the creditors should have been in a position to insist that their claims be paid, perhaps in full.  Instead, they have suffered nothing but delay.  With payments completed, the Debtor's mistakes are now irreparable because no further plan modifications are possible.[154]  Even if the unsecured creditors "enjoy" the benefit of not being discharged since their claims were neither disallowed nor provided for by the plan,[155] the reality is that they have been denied access to the best venue in which to promptly demand the value of the BMW.  Accordingly, the Court finds that the creditors have been severely prejudiced by the Debtor's failings in this case.

For all these reasons, the Court concludes there is ample cause to dismiss this case for bad faith under section 1307(c).  But dismissal alone is not an adequate remedy in this case because the concealment of a substantial unencumbered asset warrants a consequence befitting the gravity of the issue and its impact on creditors.  Frankly, this is evident from the Debtor's preference that the case be dismissed.  To that end, section 349(a) permits the Court to dismiss a case with prejudice to the filing of a subsequent petition.[156]  A lack of good faith is sufficient cause for a dismissal with prejudice.[157]  Therefore, the only question remaining is the appropriate length of the filing bar.

The Court starts with the premise that the Debtor enjoyed the automatic stay for the full term of her chapter 13 plan and, by her own admission, achieved her goal for the case by bringing her mortgage and real estate tax obligations current.  If a chapter 13 discharge was on the

---

[154]    See 11 U.S.C. § 1329(a).

[155]    11 U.S.C. § 1328(a).

[156]    11 U.S.C. § 349(a).

[157]    See In re Ward, 610 B.R. 804, 807 (Bankr. W.D. Pa. 2020); In re Stone Fox Cap. LLC, 572 B.R. 582, 591 (Bankr. W.D. Pa. 2017) (citing In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 304 (Bankr. D. Del. 2011)).

table, the deficient matrix would have meant that it could not have discharged the Debtor from any prepetition claims that did not receive notice of the bankruptcy.  Statutorily, the entry of a chapter 13 discharge also would have prevented those same claims from being discharged in chapter 7 for at least another year.[158]  Based on these observations, it is fair to say that a one-year restriction on receiving a chapter 7 discharge is merely the natural consequence of failing to provide notice to creditors in a completed chapter 13 case.  A corollary to that proposition is that dismissal without prejudice under such circumstances would permit the Debtor to immediately seek a chapter 7 discharge of the omitted creditors (as well as the claims that would have been discharged in chapter 13) and is effectively no penalty at all.  The takeaway is that a one-year filing bar would not truly penalize the Debtor's bad faith conduct given the deficient matrix, necessitating an additional year to provide the appropriate sting.  Accordingly, the Court will impose a two-year filing bar on future bankruptcy filings.

## IV.    CONCLUSION

In light of the foregoing, the Court will enter an order dismissing this case with prejudice and imposing a two-year filing bar.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated: September 30, 2022

_____
GREGORY L. TADDONIO
CHIEF UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Debtor
Attorney Spyra
Chapter 13 trustee

---

[158]    _See_ 11 U.S.C. § 727(a)(9).